STATE of Missouri, Respondent,

v.

Marcus L. BRUMMALL, Appellant.

No. WD 58124.

Missouri Court of Appeals,
Western District.

May 7, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 3, 2001.

Application for Transfer Denied
Aug. 21, 2001.

---

**16.** *Id.* at 9.

**17.** *Id.*

**18.** *Id.* at 10.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty., Gen., Dora A. Fichter, Asst. Atty. Gen., Jefferson City, for respondent.

Before EDWIN H. SMITH, P.J., and SMART and HOWARD, JJ.

HOWARD, Judge.

Marcus L. Brummall appeals from his convictions of one count of murder in the second degree, § 565.021,[1] and one count of armed criminal action, § 571.015. Brummall raises two points on appeal. First, he contends the trial court erred in refusing to submit his offered instructions for the lesser-included offenses of voluntary and involuntary manslaughter, in that the evidence presented at trial provided a basis for an acquittal of both murder in the first degree and murder in the second degree, and a conviction of either voluntary manslaughter or involuntary manslaughter. Second, Brummall contends the trial court erred in permitting the State to introduce the testimony of Amanda Bennett regarding a conversation she had with a man named "Marc" sometime before Jamie Paine was killed, in that the testimony was inadmissible hearsay and was not part of the res gestae of the offenses charged.

We affirm.

---

1. All statutory references are to RSMo 1994.

## Facts

In January 1997, Jamie Paine lived with her mother, Jacqueline Ehwa, at 6844 Holmes in Kansas City, Missouri. Jamie was seventeen and attended the Don Bosco School, an alternative high school in Kansas City. Jamie took the Metro bus to school, usually leaving around 10:30 a.m. and returning home between 4:00 p.m. and 5:00 p.m. Jamie frequently befriended people on the bus and invited them to her house.

On January 20, 1997, Jamie was not attending school because of a holiday, and she spent the day at home. Ms. Ehwa left for work around 4:15 p.m. or 4:30 p.m. that day. Jamie was watching television when her mother left for work.

Ms. Ehwa returned from work around 9:15 p.m. and found Jamie dead under a comforter on the floor of her bedroom. Jamie had been stabbed numerous times and had a knife from Ms. Ehwa's kitchen stuck in her face. Jamie had defensive wounds, indicative of a struggle, on her arms and hands. Police officers investigating the case found a trail of dripping blood that went from Jamie's bedroom to an upstairs bathroom, down the stairs, through the kitchen, dining room and living room, and out onto the front porch. The house showed no signs of forced entry. Jamie's dogs were penned in their kennel, as they usually were when Jamie had company. Two VCR's were missing from the house—one from Jamie's bedroom and one from the living room.

DNA analysis of the blood in Jamie's house revealed that Marcus Brummall was likely the source of blood drops on the entertainment center in Jamie's room. Brummall's DNA profile was also present in blood drops found on items located in the living room and bathroom. Analysis revealed a mixture of DNA on the knife found in Jamie's face. The major component of blood belonged to Jamie. The minor component would exclude Brummall as a source if the blood belonged to only one person, but if the minor component was a mixture of blood of two or more individuals, then Ms. Ehwa and Brummall could not be excluded as sources. Whether the minor component contained the blood of more than one person was indeterminable. Hairs recovered from Jamie's body did not match Brummall's hair standard, and Brummall's fingerprints were not found in Jamie's house.

On October 7, 1997, Detectives William Wilson and Donna Greenwell went to see Brummall at a prison in Cameron, Missouri. The detectives told Brummall that they were investigating a homicide in Kansas City. Brummall told the detectives that in January 1997 he was working in the vicinity of 19th and Main in Kansas City and got off work around 3:30 to 4:00 p.m. Brummall told the detectives that he took the Metro bus to and from work. Later in the interview, Brummall told them that he got off work around 5:30 p.m. and that his boss would drive him home.

During the interview, Detective Wilson saw what looked like a scar on Brummall's right wrist. When he asked Brummall about it, Brummall put his hands under the table and then said that he had tried to have an M tattooed on his wrist, but the tattoo did not take because it was done with a dull needle.

The detectives showed Brummall a photograph of Jamie Paine. Brummall pushed the photograph away and sat back in his chair, clenched his fists, trembled, and then gave shorter answers than he had given before. Detective Greenwell asked Brummall if he knew Jamie Paine, and Brummall asked if she was Hispanic. Upon being told that Jamie was white, Brummall said that he did not date white

girls, and that he did not know her or where she lived. At that time, Brummall asked that the interview terminate.

Brummall was charged by indictment with murder in the first degree, § 565.020, and armed criminal action, § 571.015. On November 15, 1999, the cause went to trial before a jury in the Circuit Court of Jackson County, Missouri. The jury found Brummall guilty of murder in the second degree, § 565.021, and armed criminal action. The court sentenced Brummall to life in prison on the count of murder in the second degree and fifty years in prison on the armed criminal action count. This appeal follows.

### Point I

Brummall's first point on appeal is that the trial court erred in refusing to submit his offered instructions for the lesser-included offenses of voluntary and involuntary manslaughter, in that the evidence presented at trial provided a basis for an acquittal of both murder in the first degree and murder in the second degree, and a conviction of either voluntary manslaughter or involuntary manslaughter. Brummall argues that the case against him was entirely circumstantial and there was evidence from which the jury could find that one or more other people besides Jamie Paine and him were present in the house at the time of the offense, so that the jury could have found that he did not deliberate or act knowingly in causing the death of Jamie Paine, but rather caused her death under the influence of sudden passion or recklessly.

Defense counsel asked the court to instruct the jury on the lesser-included offenses of murder in the second degree, voluntary manslaughter, and involuntary manslaughter. The court instructed the jury on second degree murder, but refused the instructions on voluntary and involuntary manslaughter.

In *State v. Hineman,* 14 S.W.3d 924, 927 (Mo. banc 1999), the Missouri Supreme Court stated as follows:

The trial court is not obligated to give a lesser-included offense instruction unless the evidence supports acquitting the defendant of the greater offense and convicting him of the lesser offense. Section 556.046.2; *State v. Mease,* 842 S.W.2d 98, 111–12 (Mo. banc 1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993); *State v. Barnard,* 972 S.W.2d 462, 466 (Mo.App.1998). The defendant is not required to put on affirmative evidence as to the lack of an essential element of the higher offense. *State v. Santillan,* 948 S.W.2d 574, 576 (Mo. banc 1997).... If there is any doubt concerning the evidence, the trial court should resolve any doubts in favor of instructing on a lower degree of the crime, leaving it to the jury to decide which of two or more grades of an offense, if any, the defendant is guilty. *Id.* at 577.

We emphasize that there must be *some* evidence in the record that would support the instruction. *See State v. Maynard,* 954 S.W.2d 687, 690 (Mo.App. W.D.1997). In determining whether there was sufficient evidence to entitle a defendant to an instruction on a lesser-included offense, we review the evidence in the light most favorable to the defendant. *State v. Stanley,* 990 S.W.2d 1, 5 (Mo.App. W.D.1998).

The issue in this case is whether the evidence, in fact or by inference, provides a basis for both an acquittal of first and second degree murder and a conviction of involuntary or voluntary manslaughter. *See State v. Smith,* 966 S.W.2d 1, 5 (Mo. App. W.D.1997). Second degree murder, voluntary manslaughter and involuntary manslaughter are all lesser-included of-

fenses of first degree murder. § 565.025.2. "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. "A person commits the crime of murder in the second degree if he ... [k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person...." § 565.021.1(1).

We first address whether the trial court erred in refusing to submit the proposed voluntary manslaughter instruction. "A person commits the crime of voluntary manslaughter if he ... [c]auses the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death under the influence of sudden passion arising from adequate cause...." § 565.023.1(1). " 'Sudden passion' means passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." § 565.002(7). " 'Adequate cause' means cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." § 565.002(1).

█ Brummall contends that while there was no direct evidence of sudden passion introduced at trial, the State alluded to a factual scenario under which the jury could have found that the perpetrator acted under the influence of sudden passion. Specifically, Brummall points to the prosecutor's remarks during closing argument that suggested Jamie may have refused his sexual advances and that may have "set him off." Comments made by the prosecutor in closing argument are not evidence, *State v. Hibler*, 21 S.W.3d 87, 98 (Mo.App. W.D.2000), and the jury was so instructed in this case. We find that there was no evidence by which a reasonable jury could have found that Brummall caused Jamie's death "under the influence of sudden passion arising from adequate cause." Any such finding by the jury would have been purely speculative. Therefore, the trial court did not err by refusing to instruct the jury on voluntary manslaughter.

█ We next address whether the trial court erred in refusing to submit the proposed involuntary manslaughter instruction. "A person commits the crime of involuntary manslaughter in the first degree if he ... [r]ecklessly causes the death of another person...." § 565.024.1(1). "A person 'acts recklessly' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4.

Brummall contends that there was no evidence as to exactly what happened during the altercation that resulted in Jamie's death, and there was no evidence of how many people were in the house at the time Jamie was killed. Brummall further contends that evidence of another unknown person's DNA was found on the handle of the knife, and numerous hairs, not consistent with his hair, were found on Jamie's body, and therefore the possibility of one or more other people being present during the altercation cannot be ruled out. Brummall argues that the jury reasonably could have inferred that any role he played in the stabbing of Jamie was a reckless response to injuries inflicted on him at the scene. Again, we find there was no evidence by which a reasonable jury could

find that Brummall recklessly caused Jamie's death, and any such finding by the jury would be based on pure speculation. Thus, the trial court did not err in refusing Brummall's proposed involuntary manslaughter instruction. Point I is denied.

## Point II

Brummall's second point on appeal is that the trial court erred in permitting the State to introduce the testimony of Amanda Bennett regarding a conversation she had with a man named "Marc" sometime before Jamie Paine was killed, in that the testimony was inadmissible hearsay and was not part of the res gestae of the offenses charged. Brummall contends that Amanda's testimony prejudiced him because it was based on an unreliable identification of him as the man she met on the bus.

During their investigation of Jamie's murder, officers interviewed some of Jamie's classmates from Don Bosco, including Amanda Bennett. Amanda told the police that she had met a man named Marc at a bus stop near the school. The police showed Amanda photographs, including a picture of Brummall, but Amanda could not identify anyone as the man she had met at the bus stop. Following Brummall's interview with the police, Amanda viewed a videotaped lineup, which included Brummall. Amanda identified Brummall as the man she had discussed with police.

At trial, Amanda testified that she and Jamie Paine were classmates at Don Bosco, beginning in October 1996. Amanda testified that she told the police about a black man, about five feet, ten inches tall, with a medium build, a gold tooth, and a scar on his right cheek. Amanda identified Brummall as the man she had described to the police. Amanda testified that she met the man between November 1996 and January 1997 on a Metro bus that she boarded outside Don Bosco, at Garfield and Independence Avenue. The man approached her on the bus and asked her if she went to school across the street. Amanda said yes, and the man asked her if she knew Jamie. Amanda said that she did know Jamie, and the man said that he lived somewhere between 16th and 20th Streets. When Amanda got off the bus, the man told her to tell Jamie that she had seen him.

Defense counsel objected to Amanda's testimony concerning her conversation with Brummall. The trial court overruled the objection on the basis that Brummall's statements to Amanda were admissions by Brummall, "particularly in view of the fact that he denies any knowledge or acquaintanceship with the deceased."

■■ We review claims of erroneous admission of evidence for abuse of discretion. *State v. Johns*, 34 S.W.3d 93, 111 (Mo. banc 2000), *cert. denied*, 2001 WL 292154 (2001). "A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.*

In *State v. Gilmore*, 22 S.W.3d 712, 718 (Mo.App. W.D.1999), we stated as follows:

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. [*State v.*] *Barnett*, 980 S.W.2d [297,] 306 [ (Mo. banc 1998) ]. Hearsay statements are generally inadmissible. *Id.* The admission of a party opponent, however, is not hearsay. *State v. Brown*, 833 S.W.2d 436, 438 (Mo.App. 1992). All that is required for the admission of a party opponent to be admitted into evidence is that "the statements must be material to the issues of the

case, must have sufficient probative value to be relevant, and must be offered by the opposing party." *Id.* at 439. The admission of a criminal defendant is relevant and material if it tends to incriminate the defendant, to connect the defendant to a crime, ort [sic] to manifest the defendant's consciousness of guilt. *State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993). The defendant need not expressly acknowledge his or her guilt for the statement to qualify as an admission. *State v. Bannister,* 680 S.W.2d 141, 148 (Mo. banc 1984). To determine whether the statement constitutes an admission, the statement must be viewed in light of the surrounding circumstances. *Id.*

■ Brummall argues that his conversation with Amanda took place "weeks, if not months" before Jamie's death, and that his comments "at a time so far removed from the charged offenses should not be considered admissions." However, Brummall cites no authority in support of this proposition. Rather, Brummall contends, the comments should be examined to determine whether they fall under the res gestae exception to the hearsay rule. We decline to conduct such an examination, as we find that Amanda's testimony concerning her conversation with Brummall was properly admitted as an admission that Brummall knew Jamie—which he had previously denied—and connected Brummall to the crime in the present case. Point II is denied.

The judgment of the trial court is affirmed.

EDWIN H. SMITH, P.J., and SMART, J., concur.