STATE of Missouri, Respondent,

v.

Amanda EISELE, Appellant.

No. ED 98688.

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 20, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 8, 2013.

Application for Transfer Denied
Dec. 24, 2013.

N. Scott Rosenblum, Saint Louis, MO, for Appellant.

Shaun J. Mackelprang, Jefferson City, MO, for Respondent.

CLIFFORD H. AHRENS, Judge.

Amanda Eisele appeals from the judgment of the trial court entered after a jury convicted her of assault in the second degree in violation of section 565.060 RSMo. 2000.[1] Finding no error, we affirm.

Viewed in the light most favorable to the judgment, the evidence is as follows. J.G. was born on March 15, 2010, to Toby G. ("Father") and Melissa G. ("Mother"). Mother and Father were seeking a part-time nanny for J.G., and found Eisele, a nineteen year old college student, on a website for caregivers. Eisele worked for Mother and Father from May 12, 2010 until June 18, 2010, typically taking care of J.G. three days a week from approximately 11:30 a.m., when Mother went to work, until roughly 4:30 p.m. when typically Father returned home from work. J.G.'s visits to the office of his regular pediatrician, Dr. Isabel Fernandez–Holtzman ("Pediatrician") following birth until May 12, 2010 were uneventful. Mother noticed that Eisele's enthusiasm for the job quickly ebbed and that she had little interest in the list of instructions that Mother had prepared. J.G.'s maternal grandmother, Betty L. ("Grandmother") also babysat for J.G. every Tuesday, and sometimes other days as well. Prior to the end of May 2010, J.G. was described as a "good baby" who seldom cried.

On Friday May 28, 2010, Mother returned home, with J.G. asleep in a swing, wrapped with a blanket. Eisele told Mother that he was fine and left. When J.G. woke up, Mother and her sister-in-law started to change him, and noticed a bruise-like mark on J.G.'s left arm that had not been there when Mother left J.G. in Eisele's care that morning. Father also noticed the mark. J.G. was very fussy and "inconsolable" throughout the Memorial Day weekend, relaxing only when Father held him in a manner that reduced pressure on J.G.'s back. On June 1, 2010, Grandmother babysat for J.G., and noticed that he was extremely fussy, and acting as if he were in pain, which she thought was due to a stomach ache. Trying to burp J.G. caused him to scream and cry, and rubbing his back also irritated him. Grandmother called Mother to tell her that something was wrong with J.G., as he had been crying all day. Mother replied that he had been like that all weekend.

On June 2, 2010, Eisele took care of J.G. Mother asked her about the mark on his arm from the previous Friday, and Eisele did not recall seeing a scratch on him. Mother asked if J.G. had gotten his arm stuck in something, as the mark looked more like a "pinch," and Eisele told her no. Thereafter J.G. was fussy in the mornings, but calm when Father held him, but Mother and Father decided to take him to Pediatrician. Father took J.G. to Pediatrician's office on June 4, 2010. Father told the nurse practitioner that J.G. was fussy

**1.** Unless noted otherwise, all further citations are to RSMo.2000.

and "grunting." J.G. was x-rayed and diagnosed with possible early pneumonia. He was prescribed antibiotics. A later, careful reexamination of the x-ray revealed rib fractures, but at the time these were unnoticed. On June 7, 2010, J.G.'s breathing was rapid and he was grunting as he breathed. In addition he was vomiting and having diarrhea. J.G. was taken to Pediatrician's office, and the nurse practitioner sent J.G. and his parents to the emergency room at Children's Hospital to check for a possible bowel problem. X-rays were taken that ruled out an intestinal issue. The ER staff told the parents to have J.G. finish taking the antibiotics for possible pneumonia and to follow up with his doctor. Subsequent re-examination of the x-rays taken on June 7 showed evidence of rib fractures, but again this was not perceived at the time of the ER visit. Mother called the ER physician the following day to report that J.G. was still breathing fast and heavy and crying a lot, but that he seemed better.

On June 16, 2010, Mother took J.G. back to Pediatrician's office. Mother told the doctor that J.G. continued to be very fussy, and was spitting up. However, J.G.'s lungs sounded clear, and Pediatrician thought that the presumed pneumonia was improving. Pediatrician put J.G. on Zantac for possible acid reflux due to the spitting up. She did examine J.G.'s extremities during this visit, pressing on the arms and legs and saw no evidence of fractures.[2]

Mother and Eisele continued to have friction. Mother perceived an "attitude" from Eisele whenever she tried to discuss J.G. with her. She noticed that J.G. would start to scream when Eisele would pick him up in the morning. When asked, Ei-

sele told Mother that J.G. "pretty much" cried all the time when she was there, but blamed it on Mother's presence. Mother was also disturbed by Eisele's language when discussing the latter's step-mother. Mother and Father decided to terminate Eisele, and on June 18, 2010, Father told her that her services were no longer needed because his work hours were being cut. This was untrue, but Father wanted to spare Eisele's feelings, and also offered her a bonus termination check that she never picked up. Thereafter J.G. was cared for by Mother, Father, Grandmother, and Mother's sister.

A few days after discharging Eisele, Father noticed that J.G. was using his left arm noticeably more than his right arm. Mother palpated his right arm, but J.G. did not react. Although Mother thought that his right arm was "very floppy," she and Father did nothing at the time because J.G. was not crying about it. They noticed that J.G.'s use of his right arm seemed to improve over the following several days.

Mother and Father took J.G. to Pediatrician's office on June 28, 2010, to examine a skin problem prior to going on a family vacation. Father told the nurse practitioner about J.G.'s arm problem. She palpated his right arm and got a pain response, prompting an x-ray of the arm. This June 28th x-ray revealed that the major bones in J.G.;'s right forearm were broken and in the process of healing. Pediatrician also thought that another break had already healed. Based on her positive experiences with Mother and Father, Pediatrician allowed them to take J.G. home to take him to an orthopedic center the next day for further examination, rather than

---

2. She testified that J.G.'s lack of reaction to her testing of his arms and legs might have been due to his being on Tylenol at the time.

have J.G. sent directly to the hospital by ambulance due to suspected child abuse. On June 29, 2010, Mother took J.G. to an orthopedic center for a full skeletal survey x-ray. The June 29th x-ray revealed multiple fractures, including multiple broken ribs on both sides of J.G.'s ribcage, the two right forearm fractures, a fracture of the left forearm, and a fracture of the left leg tibia. All of the fractures save for the last seemed to be in various stages of healing. Given J.G.'s age, the fractures had to be non-accidental inflicted injuries. J.G. was admitted to Children's Hospital for several days.

Detective Harolton Clayborn of the St. Louis County Police Department, Child Abuse Unit, interviewed Mother and Father separately, giving each Miranda warnings, which Mother and Father respectively waived. He talked with each parent for over an hour, and found them cooperative and concerned. Both denied injuring J.G., and provided Det. Clayborn with Eisele's name. On July 2, 2010, Detective Emily Mancuso of the St. Louis County Police Department and another officer picked Eisele up at her home and brought her to the police station for questioning. Det. Clayborn led the interview of Eisele, with Det. Mancuso present to provide "a familiar face" to Eisele. Both officers were in plain clothes with no weapons. Det. Clayborn gave Eisele a warning and waiver form, read her the Miranda rights, one by one, and had her initial each right after he read to acknowledge that she understood each right. Eisele signed the warning and waiver form, agreeing to waive her rights and provide a statement without an attorney present.

Det. Clayborn did not tape the initial part of the interview with Eisele, as existing policy did not mandate recording an interview until and unless the interviewee confessed. After some initial questioning,

he asked her if she had ever noticed any problems with J.G., and she responded that he had been recently diagnosed with acid reflux, he had a scratch on his face, and had had a bruise on his left arm. When asked if she knew anything about J.G.'s arm fractures, she replied that she knew nothing about it. Det. Clayborn gave Eisele the medical affidavit that listed the 18 fractures that J.G. suffered, and he noticed that she appeared to be about to cry. He asked her if she had ever dropped J.G., which she denied. Det. Clayborn listed four possible people who might have hurt J.G.—Mother, Father, Grandmother, and Eisele herself, and mentioned that J.G. was going into protective custody. He asked Eisele if she had any knowledge of Mother, Father, or Grandmother harming J.G., whereupon she began to cry. Eisele told Det. Clayborn that she might have held J.G. too hard, that the screaming and crying drove her crazy. He asked her whether she "did it" or did not do it, and if she did it, then J.G. and his half-brother could be reunited with Mother and Father. Eisele continued to cry and said how she held J.G. and squeezed him, and demonstrated what she did for Det. Clayborn. She said that she was frustrated from J.G.'s crying. Eisele told Det. Clayborn that the squeezing had happened twice, and he told her that the extent of the injuries made the police believe that it happened more than two times. Eisele admitted that squeezing incidents happened three more times. When asked, she demonstrated how she had held him and squeezed him with her hands. She further stated that she would cradle J.G. by supporting him by the left leg, and when he would not take a bottle, she would roll him into her chest and squeeze him.

Dets. Clayborn and Mancuso gave Eisele a baby doll and asked her to demonstrate what she did using the doll. Eisele

complied. She said she acted out of frustration at J.G.'s crying at the time, which was driving her crazy, and that she lost control. She also demonstrated a cradling motion that she used with J.G., and said that she would get frustrated when he would not take a bottle when he was hungry, so she would firmly roll her arm, squeezing him hard against her chest while holding his left leg in her hand. The interview stopped briefly for a break. At no point during the unrecorded part of the interview did Det. Clayborn or Det. Mancuso make threats or promises to Eisele, nor did either or them suggest to Eisele that she had hurt J.G. by squeezing him, nor did they raise their voices to her.

Det. Clayborn decided to record the remainder of the interview after the brief break. He and Det. Mancuso discussed her Miranda rights with Eisele, then had her re-demonstrate how she had squeezed J.G. She stated that she had squeezed his chest five times and had squeezed him using the cradling position twice. Eisele said that these acts of squeezing had happened towards the end of May 2010 when J.G. was sick and cried "all the time." She indicated that she thought that she was responsible for the rib fractures to J.G. by squeezing him. They presented Eisele again with the warning and waiver form, and confirmed again that she had been informed of her rights and that she was talking to them of her own free will.

Eisele was charged by amended information with assault in the second degree for recklessly causing serious physical injury to J.G. by breaking his bones between May 12, 2010, and June 18, 2010. Eisele's attorneys filed a motion to suppress her statement to the police, which was overruled after a hearing. The State filed a motion in limine to exclude questioning Mother about being on Lexapro as impeachment. After a hearing in which Mother stated that she had been taking Lexapro per prescription for over a year and that it did not affect her perceptions or memory, the trial court sustained the State's motion in limine. Defense counsel did not present any expert testimony at this hearing.

At trial, Mother, Father, and Grandmother testified for the State. In addition, Dr. Kim Hamlin, a pediatrician hospitalist, Dr. Robert Paschall, a pediatrician subspecialty board-certified in child abuse pediatrics, Dr. Thomas Herman, a pediatrician/radiologist, testified, and Pediatrician testified. Det. Clayborn and Det. Mancuso also testified. Eisele testified on her own behalf. Dr. Gregory Cizek, a radiologist, and Dr. Richard Lehman, an orthopedist, testified as experts for Eisele. Numerous exhibits were entered into evidence, including J.G.'s x-rays and medical reports, as well as the recording of Eisele's statement to the police. Eisele's testimony regarding the pre-recorded portion of her interview with the police conflicted sharply with that of Det. Clayborn and Det. Mancuso. She testified that the police intimidated her during the interview and they first suggested that she had squeezed J.G.; that she did not spontaneously tell the police that she may have squeezed him too hard and caused his fractured ribs. Dr. Hamlin for the State testified that squeezing a baby in the fashion demonstrated on the recording of Eisele's police interview could cause the rib fractures evident in the x-rays, and that blunt force trauma did not cause those injuries. Dr. Hamlin also testified that the force required to cause those fractures could not have been done negligently. Eisele's medical experts testified that the rib fractures could not have been caused by the squeezing demonstrated in the recording.

The jury returned a verdict of guilty on the count of assault in the second degree. The trial court sentenced Eisele to five years' imprisonment and to serve 120 days of shock time. Eisele now appeals from this judgment.

■ To facilitate our analysis, we initially will address Eisele's fifth point relied on. In this point, Eisele alleges that the trial court erred in admitting her statements to the police because "no statement evidenced a consciousness of guilt such that the statements fell within an exception to the hearsay rule" and she was thereby denied her constitutional rights to a fair trial and due process of law.

■ The trial court has broad discretion regarding the admission or exclusion of evidence at trial, and its discretion will not be disturbed without a clear abuse of discretion. *State v. Holmquest*, 243 S.W.3d 444, 449 (Mo.App.2007). There is an abuse of discretion only if the trial court's ruling is against the logic of the circumstances or appears unreasonable or arbitrary. *State v. Hudson*, 230 S.W.3d 665, 668 (Mo.App.2007). The trial court did not abuse its discretion if reasonable persons could disagree about the propriety of its decision. *State v. Raines*, 118 S.W.3d 205, 209 (Mo.App.2003).

■ A hearsay statement is an out-of-court statement that is offered for the truth of the matter asserted. *State v. Simmons*, 233 S.W.3d 235, 237 (Mo.App. 2007). In general, hearsay statements are inadmissible. *Id.* However, the admission of a party opponent does not constitute hearsay. *Id.* A statement can be admitted as an admission of a party opponent if it is material to the issues of the case, is relevant to the case, and is offered by the opposing party. *Id.* "[T]he admission of a criminal defendant is relevant and material if it tends to incriminate the defendant, to

connect the defendant to a crime, or to manifest the defendant's consciousness of guilt.'" *Id.* (quoting *State v. Brummall*, 51 S.W.3d 113, 119 (Mo.App.2001)).

Eisele's statement connected her to injuries inflicted on J.G., did incriminate her, and manifested a consciousness of guilt. She admitted to the police that she had repeatedly squeezed J.G. "too hard" and demonstrated how she had squeezed him. Her description and demonstration of how she had squeezed J.G.'s chest matched Dr. Hamlin's medical opinion regarding the cause of J.G.'s rib fractures. She stated to the police and demonstrated how she had also rolled and squeezed J.G. to her chest "hard," holding his left leg, which may have caused the fractures to his leg and arm. She admitted being responsible for all of J.G.'s injuries, save for the one to his leg. Eisele stated that she intentionally had squeezed J.G. "hard" out of frustration with his crying and his refusal to take a bottle; she did not accidently squeeze J.G. or in the ordinary course of taking care of him. She did not tell Mother or Father that she had squeezed J.G. because she did not want them to think that she was "a horrible person[.]" She also expressed concern whether the matter would go to court and whether Mother and Father would press charges. The trial court did not abuse its discretion in admitting Eisele's statement. Point denied.

To assist our analysis, we will examine Eisele's first and second points relied on together as they address related issues. In her first point relied on, Eisele contends, in essence, that there was insufficient evidence from which a rational finder of fact could find her guilty beyond a reasonable doubt, thereby depriving her of her constitutional rights to a fair trial and due process of law. More specifically, Eisele avers that the State failed to carry its burden as to the identity of the perpetra-

tor because there were multiple caretakers with access to J.G.; the June 29th x-ray showed "nearly completely healed or healing fractures of the right ulna and right radius, requiring 8 to 10 weeks to solidify to that stage, placing the time of injury prior to Eisele's contact with [J.G.]"; J.G.'s mobility issue with his arm occurred five days after she was no longer J.G.'s caregiver; Mother reported various dates about the onset of symptoms to medical professionals, including June 4, 12, and 23, 2010, all of which would exclude Eisele, but testified at trial that the symptoms appeared when Eisele was working as a nanny, which no rational trier of fact could have concluded beyond a reasonable doubt that she inflicted the injuries to J.G. In her second point relied on, she argues that the evidence was insufficient to establish that she had the required mental state to commit assault in the second degree. Specifically, she avers that the State failed to carry its burden that she had the required mental state because no evidence showed that she consciously disregarded a substantial and unjustifiable risk in her care for J.G., "as the so-called confession reveals no recklessness nor a consciousness of risk" and the evidence about the onset of J.G.'s symptoms "is inconclusive due to [Mother's] varied and inconsistent reporting[.]" Eisele claims that no rational finder of fact could have concluded beyond a reasonable doubt that she recklessly inflicted serious physical injuries to J.G., thereby depriving her of her constitutional rights to a fair trial and due process of law.

 In reviewing a sufficiency of the evidence claim, this Court determines whether sufficient evidence allows a reasonable trier of fact to find guilt. *State v. Ecford*, 239 S.W.3d 125, 127 (Mo.App. 2007). This Court views the evidence and the inferences therefrom in the light most favorable to the verdict, disregarding all evidence and inferences to the contrary. *Id.* It is the responsibility of the finder of fact, not the appellate court, to determine the weight and credibility of all witnesses, including experts. *State v. Hayes*, 88 S.W.3d 47, 58–59 (Mo.App.2002). The finder of fact may choose to believe or reject all, some, or none of the testimony of any witness. *Id.* at 58. The finder of fact may reject a defendant's self-serving testimony. *Id.* The State has the burden of proving each and every element of the charged offense beyond a reasonable doubt. *Ecford*, 239 S.W.3d at 127. There cannot be a conviction " 'except upon evidence that is sufficient to support a conclusion that every element of the crime has been established beyond a reasonable doubt.' " *Woolford v. State*, 58 S.W.3d 87, 89 (Mo.App.2001) (quoting *Jackson v. Virginia*, 443 U.S. 307, 314–15, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

A person commits assault in the second degree if he or she recklessly causes serious physical injury to another. Section 565.060.1(3). Eisele avers that the State failed to carry its burden of proof to establish that she was the perpetrator and that she acted recklessly. We view the evidence in the light most favorable to the verdict to determine whether a rational finder of fact could conclude beyond a reasonable doubt that Eisele was guilty, i.e., that all of the essential elements of the crime could be found beyond a reasonable doubt.

 There is no dispute that J.G., with eighteen fractures, suffered serious physical injuries. Eisele contends that other caretakers had access to J.G. While this is true, it does not negate that she had access to J.G. roughly three days a week, Wednesday through Friday, from May 12, 2010 to June 18, 2010. Expert medical testimony established that with the exception of

the bucket handle fracture, all of the fractures of J.G.'s bones could have occurred during the period that Eisele was taking care of J.G.[3] Dr. Herman, a pediatric radiologist at Children's Hospital testified that fractures in children, particularly in children less than six months old, are different from adults, and that the healing of such fractures in infants is also different from that of adults. He stated that re-examination of the June 4th x-ray showed acute inferior right rib fractures, and the June 7th x-ray showed right lower rib fractures and at least three lateral left rib fractures. Dr. Herman testified that the report on the June 28th x-ray that showed J.G.'s right arm had concluded that the fracture of the right ulna was completely healed and that the fracture of the right radius was healing. Based on additional x-rays of the right arm, he disagreed with the conclusion of that report, and stated that both fractures were still healing. He opined that based on the limited x-rays of June 28 that one could have thought the ulnar fracture was completely healed, but the additional lateral x-ray showed that it was still healing. Based on the x-rays taken on June 29, 2010, he opined that the fractures of J.G.'s right arm were probably older than 10 to 14 days old and somewhere in the range of a few weeks. Based on the chest x-ray of June 29, Dr. Herman testified that the fractured ribs, which were healing, were older than 10 to 14 days and less than three months. Regarding the bucket handle fracture, he stated that they often show no evidence of healing. Dr. Herman's estimates on the age of the various fractures were all based to a reasonable degree of medical certainty. Based on this testimony, all of the frac-tures could have occurred during the period when Eisele was J.G.'s caregiver.

Eisele admitted that she had squeezed J.G.'s ribs "hard" on five occasions because she was frustrated with his crying, and that she squeezed him to her chest while holding his leg twice because he would not drink his bottle of formula. She demonstrated how she squeezed J.G. Dr. Hamlin, a pediatric hospitalist, testified that to a reasonable degree of medical certainty that J.G.'s rib fractures occurred by someone "wrap[ping] their hand around [J.G.]'s chest and squeez[ing] him." When asked how much force was needed to break the ribs of a three-month old baby, she replied "Far more than a reasonable person would exert in the normal care of that child." Dr. Hamlin testified that the injuries were life-threatening, to a reasonable degree of medical certainty, and that J.G.'s 18 fractures were the result of "[n]on-accidental trauma." She ruled out blunt trauma as a cause for the rib fractures. Eisele's description and demonstration of how she squeezed J.G. matches Dr. Hamlin's description of how the rib fractures were caused. There was sufficient evidence for a rational finder of fact to conclude beyond a reasonable doubt that Eisele was the perpetrator.

■ Eisele also argues that there was not sufficient evidence to establish that she had the required state of mind to commit the crime of assault in the second degree, which in this case was "recklessly." Section 562.016.4 states that "[a] person 'acts recklessly' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the

---

**3.** The medical experts for the State testified that it was not possible to determine the age of the "bucket handle" fracture of the leg, a type of fracture that can only occur in chil-dren because it is usually difficult, if not impossible, to determine when such a fracture has started healing, and this was the situation in this case.

standard of care which a reasonable person would exercise in the situation." Eisele admitted that she squeezed J.G. "hard" because she was frustrated by his crying, and that she squeezed him to her chest because she was frustrated that he would not take his bottle of formula when he was hungry. Dr. Hamlin testified that J.G.'s injuries were the result of non-accidental trauma, which necessarily implies something beyond negligence, evincing an intent to use excessive force. She stated that the amount of force required to break the ribs of a 3–month old child was well beyond what a reasonable person would use in taking normal care of such a child. Dr. Hamlin also testified that J.G.'s injuries were life-threatening, that the lung injuries alone could have resulted in death. She said that his breathing was compromised, and that given the injury there was no way to predict how badly damaged his lung could have been and that he could have bled massively into that side of his chest and been unable to breathe. There was sufficient evidence for a rational finder of fact to conclude beyond a reasonable doubt that Eisele had the required mental state. Points denied.

■ In her third point relied on Eisele avers that the trial court erred in denying voir dire and an offer of proof regarding Mother's stress, anxiety and related use of Lexapro, which thereby deprived Eisele of her constitutional rights to a fair trial and due process of law.

■ We review the trial court's ruling on the admissibility of evidence and the extent and scope of cross-examination for abuse of discretion. *State v. Winfrey*, 337 S.W.3d 1, 5 (Mo. banc 2011). We review for prejudice, not mere error, and will reverse only if the error is so prejudicial as to deprive the defendant of a fair trial. *Id.* Trial court error is prejudicial if

there is a reasonable probability that the error was outcome-determinative. *Id.*

■ Eisele did not seek to admit the evidence at issue to argue that Mother was the actual perpetrator of the crime against J.G., but rather for the purpose of impeaching Mother. The credibility of a witness is always a relevant issue in a lawsuit. *State v. Smith*, 996 S.W.2d 518, 521 (Mo.App.1999). "However, attacks on a witness' credibility in criminal proceedings are subject to limitations, and not every attack will be allowed." *Id.* The most common methods of impeaching a witness involve the admission of evidence regarding the following: the witness's incapacity or ability to perceive or remember; prior convictions; bias, interest, or prejudice; prior inconsistent statements of the witness; and the witness's reputation for truthfulness and veracity. *Mitchell v. Kardesch*, 313 S.W.3d 667, 675 (Mo. banc 2010).

We note that Eisele was able to cross-examine Mother regarding her memory and stress and the purported inconsistencies in reporting J.G.'s symptoms, and was able to cross-examine Father about Mother's level of stress. The sole issue appears to be the trial court's refusal to permit Eisele to question Mother about her use of Lexapro, apparently because of its potential effects on her memory and because of its use as an anti-anxiety drug. Eisele argues in her brief that Mother's credibility was at issue because she testified at the hearing on the State's motion in limine that Lexapro did not affect her memory, but testified at trial that she could not remember telling various people about J.G.'s symptoms, and responded to several other questions by stating that she did not remember. She also argues that Mother's use of Lexapro would have impeached her credibility given her testimony that she did

not experience stress beyond that of an "everyday" level.

At the hearing on the State's motion in limine Mother testified that at the time that J.G. suffered the fractures that she had been taking Lexapro for approximately one year and that it did not affect her ability to perceive things or her memory, and the trial court sustained the State's motion. The following exchange then took place:

> Defense counsel: It would be our request to be permitted to ask questions of this particular witness as it relates to the drug, Lexapro, in light of her statements and admission, that at all times are material she was taking that particular drug.
>
> State: I think it's completely irrelevant to have any questioning. We've already done further questioning. It's irrelevant to the case, and as was requested earlier or mentioned earlier by defense counsel, to go into a possible side effect of aggression I think would simply lead to a red herring.
>
> Court: My motion—the motion paragraph No. 8 in the State's motion in limine shall be sustained. There will be no mention of it during the trial.
>
> Defense counsel: You're also denying my request to voir dire her, to ask her questions to supplement your[ ] [questions]?
>
> Court: Yes. I don't think that there is any way a foundation could be made about what—at this point about—Is there an expert witness that would be used to state what side effects this drug has or anything?
>
> Defense counsel: No. I don't intend to call an expert in that context.
>
> Court: Thank you very much.

There is nothing in the record to indicate that Mother's inability to recall certain discussions at the time of trial is connected to her use of Lexapro, or would impeach her credibility based on her testimony at the pre-trial hearing, absent expert testimony about Lexapro's side-effects. Defense counsel chose not to use an expert witness to testify about Lexapro's side-effects and their frequency, and Mother's testimony about such would have been inadmissible hearsay.

Regarding Mother's use of Lexapro as impeachment of her testimony that in May and June of 2010 she was experiencing just "everyday" stress, we note that Mother testified that she was experiencing the everyday stresses that all mothers face; she did not deny having any stress. There is nothing inconsistent with those statements and her use of Lexapro for anti-anxiety given that she had been taking that drug long before J.G. was born and before the events of late May and early June 2010, which the trial court noted. The trial court did not abuse its discretion in excluding this evidence.

Assuming *arguendo* that the trial court did err in excluding evidence of Mother's use of Lexapro, there was no prejudice to Eisele. Mother was cross-examined thoroughly on her inability to recall details of conversations and purported inconsistencies in reporting J.G.'s symptoms, as well as her stress as a new mother. Eisele cross-examined Father about Mother's stress as well. Even if Mother's credibility were somehow weakened, her testimony was cumulative to that of Father and Grandmother. Father testified that he saw the bruise-like mark on J.G.'s arm at the beginning of the Memorial Day weekend. He stated that J.G. was more fussy than normal at the beginning of June 2010. Father stated that he took J.G. to the pediatrician's office on June 4, 2010, and that he told the pediatrician's office that he was slightly fussy. Grandmother testified

that J.G. was very fussy when she babysat for him the first week of June 2010, and that when she tried to burp him he screamed, and that his crying was so bad she called Mother at work. Eisele's admission of her actions and the testimony of the State's expert medical personnel would not have changed. Point denied.

■ In her fourth point relied on Eisele contends that the trial court erred in submitting Instruction No. 5 to the jury because the verdict director improperly narrowed the inquiry to only the fractured ribs, ignoring other injuries that suggested an alternate perpetrator, thereby denying her constitutional rights to a fair trial and to due process of law.

Instruction No. 5, based on MAI CR3d 319.12, stated that:

> If you find and believe from the evidence beyond a reasonable doubt:
>
> That between May 12, 2010 and June 18, 2010, in the County of St. Louis, State of Missouri, the defendant recklessly caused serious physical injury to J.G. by squeezing J.G. and breaking his ribs, then you will find the defendant guilty of assault in the second degree.
>
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.
>
> A person acts "recklessly" as to causing serious physical injury if she consciously disregards a substantial and unjustifiable risk that her conduct will result in serious physical injury and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.
>
> As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of any part of the body.

Defense counsel objected to this instruction because it was limited to J.G.'s rib fractures because there was evidence that other bones were broken, and defense counsel argued that this shifted the burden of proof to Eisele. The trial court overruled the objection.

■ We review a claim of instructional error *de novo* to determine whether the instruction was supported by the law and the evidence. *State v. Richie*, 376 S.W.3d 58, 64 (Mo.App.2012). The evidence is viewed in the light most favorable to the party submitting the instruction. *Id.* To warrant reversal on instructional error, the party challenging the instruction must show that the instruction misled, misdirected, or confused the jury, and resulted in prejudice, that is, it materially affected the merits and outcome of the case. *Id.* at 64–65.

Eisele relies on *State v. Cooper*, 215 S.W.3d 123, 126 (Mo. banc 2007). That case stands for the proposition that verdict-directing instructions must contain each element of the charged offense and require the jury to find each and every fact necessary to constitute essential elements of the charged offense. *Id.* Instruction No. 5 does not omit an essential element of the charged crime. Eisele would have this Court expand *Cooper* to cover the purported situation here, namely an instruction drawn to narrow the factual issue that the jury must find. We will not do so. Eisele's claim more appropriately seems to be that the verdict directing instruction impermissibly and improperly varied from the elements set out in the amended information that charged Eisele with second degree assault.

■ "The purpose of an indictment or an information is to inform the accused of the charges against her so that she may prepare an adequate defense[.]" *State v. Barnes*, 942 S.W.2d 362, 367 (Mo. banc 1997). A variance exists between the charging information and the verdict directing instruction when the instruction submits a method of committing the crime that is different from the method charged in the information. *State v. Smith*, 330 S.W.3d 548, 554 (Mo.App.2010). A variance is not per se grounds for reversal; it is not fatal and does not require reversal unless it submits a distinct, new offense from that with which the defendant was charged. *State v. Darden*, 263 S.W.3d 760, 763 (Mo.App.2008). To warrant reversal, a variance must be material and must prejudice the defendant. *Id.* Variances are material when they affect whether the defendant received adequate notice, and are prejudicial when they affect the defendant's ability to defend against the charges. *Id.*

The amended information and Instruction No. 5 identified the same offense, namely assault in the second degree. The amended information charged Eisele with assault in the second degree by recklessly causing serious physical injury to J.G. "by breaking his bones." Instruction No. 5 required that the jury find that Eisele recklessly caused serious physical injury to J.G. by squeezing J.G. and breaking his ribs. The variance between the charging document to the verdict director was not material, and Eisele does not argue that she was not aware of being charged with breaking J.G.'s ribs. It did not prejudice her ability to defend herself, inasmuch as the defense was that Eisele did not break any of J.G.'s bones, and could not have been the perpetrator due to the timing of the fractures. Point denied.

The judgment of the trial court is affirmed.

ROY L. RICHTER, P.J., and GLENN A. NORTON, J., concur.