

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD76655 |
| | ) | |
| v. | ) | OPINION FILED: October 7, 2014 |
| | ) | |
| CHADWICK LELAND WALTER, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
The Honorable Larry D. Harman, Judge

Before Division Three: Gary D. Witt, Presiding Judge, Joseph M. Ellis, Judge and
Thomas H. Newton, Judge

Chadwick Leland Walter ("Walter") appeals from his convictions of one count of

attempted manufacture of a controlled substance under Section 195.211[1] and one count of

maintaining a public nuisance under Section 195.130 following a jury trial. Walter was

sentenced as a prior and persistent drug offender to concurrent sentences of fifteen years

for the drug conviction and eight years for the nuisance conviction. Walter brings five

points on appeal. He asserts: (1) that the evidence was insufficient to convict him on

both counts, (2) error in the denial of motions to quash the search warrant and to suppress

---

[1] All statutory references are to RSMo 2000 as currently supplemented unless otherwise indicated.

evidence, (3) error in the admission of testimony based on other crimes, (4) error in overruling hearsay objections, and (5) error in closing arguments. We affirm.

## FACTUAL AND PROCEDURAL HISTORY[2]

On August 4, 2011, Walter and his live-in girlfriend, Kathy Martinson ("Martinson"), drove from their residence in Saline County to the City of Marshall. They went to a Wal-Mart store and purchased lithium batteries. They then went to a Red Cross Pharmacy where Walter purchased pseudoephedrine pills and separately Martinson purchased additional pseudoephedrine pills. Later that same day, Walter and Martinson purchased pseudoephedrine pills from a Wal-Mart. Martinson then went to a different Red Cross Pharmacy and purchased additional pseudoephedrine pills. Martinson then returned to the Wal-Mart and purchased Coleman Camp Fuel. Martinson testified that she had the intent to manufacture methamphetamine in purchasing these items. Lithium batteries, pseudoephedrine, and camp fuel are all ingredients that are used to produce methamphetamine.

At 6:45 p.m. that same day, Shane Nicholson ("Nicholson"), an acquaintance of Walter's, was pulled over for a traffic violation. Trooper Christopher Sullivan ("Trooper Sullivan") placed Nicholson in custody and brought him to the Saline County Sheriff's office. While there, Trooper Sullivan viewed a text message on Nicholson's cell phone that identified the sender as "Chad." Nicholson's cell phone also received a phone call at 8:10 p.m. while he was still at the sheriff's office. Trooper Sullivan asked Nicholson to

---

[2] "We view the facts in the light most favorable to the verdict." *State v. Zetina-Torres*, 400 S.W.3d 343, 346 n.1 (Mo. App. W.D. 2013) (citation omitted).

2

put the cell phone on "speaker" so he could hear the conversation, which lasted about a minute or a minute and a half. Trooper Sullivan recognized Walter's voice. Nicholson asked Walter if "it was fire" and Walter replied, "yeah." "Fire" was explained to mean "good" or "excellent" quality drugs among methamphetamine users.

In the early hours of August 5, 2011, Trooper Sullivan obtained a search warrant for Walter's residence. Trooper Sullivan's affidavit in support of the application for a search warrant included, *inter alia*: (1) that the trooper had received information that Walter was "cooking" methamphetamine that night in the basement of his residence, (2) that he learned another individual was at Walter's "getting ready to get high," (3) that Walter indicated "it was fire," which meant that the methamphetamine was "good," (4) that Walter said to an informant that it "snowed last night," meaning that he had cooked methamphetamine, (5) that a Missouri database available to law enforcement indicated that Walter had made two purchases of ephedrine and pseudoephedrine on August 4, 2011, which exceeded the legal amount of that product which may be purchased in a twenty-four hour period, and additionally that Walter was denied purchases of pseudoephedrine at a Wal-Mart on August 4, 2011 twice because he attempted to purchase in excess of the allowed amount, and (6) that Martinson had also purchased pseudoephedrine on August 4, 2011.

The search warrant authorized, among other items, a search for methamphetamine and any articles used in the sale, distribution, or manufacture of methamphetamine. The place to be searched was described as:

3

A residential structure with a street address of 24808 155th Road in Saline County, Missouri, located on the south side of 155th Road, and described as a gray single-story wood frame home, with vinyl siding and a wooden deck located on the south side of the residence. The residence has a basement and a detached two car garage. In addition, there is an outdoor wood burning furnace on the exterior of the residence.

At 1:25 a.m. Trooper Sullivan and nine other officers served the search warrant. When the police entered Walter's residence, he was in the basement, and Martinson was in the kitchen. There were no other individuals present. Trooper Sullivan provided Walter with the search warrant, and Walter said "you guys won't find anything here." As the officers were in the basement and Walter made that statement, Trooper Sullivan observed a Wal-Mart card with white powder residue on it and a razor blade next to it together with a corner-cut baggie with white powder residue inside it. Upon observing the white powdery residue, Walter was placed under arrest. Trooper Sullivan also took possession of a syringe found inside the pocket of a pair of jeans shorts found nearby as well as a baggie containing a white powdery substance in a bourbon container near the bar area of the basement that was later determined to be methamphetamine.

Deputy Richard Miller ("Deputy Miller") was one of the law enforcement officers who served the warrant. In Walter's basement, Deputy Miller located and catalogued the following items: salt, lithium batteries, two quarts of acetone, starting fluid (which contains ether), an unmarked container containing Liquid Fire (which contains acid). All are items used in the production of methamphetamine. Deputy Miller also found a propane torch in the basement, which is used to consume methamphetamine, and a metal spoon with powdery residue.

4

The outside wood burning stove or furnace is "fairly close to the residence," is connected to the residence by electrical wiring, and has underground pipes or ducts to heat the house. In the area in and around the stove, Deputy Miller found burnt lithium batteries, burnt packaging for ephedra or pseudoephedrine pills, a burnt acetone container, a burnt Coleman fuel container, and burnt syringes. These items can be used in the production of methamphetamine.

The two-car detached garage is approximately ten feet from the residence, and is also connected to the residence by electrical wiring. Deputy Miller detected a strong chemical smell from the garage. Parked inside was a blue 1982 Chevrolet truck, which was registered to Walter and his estranged wife (not Martinson). The engine compartment of the truck was partially opened, and officers discovered therein items used in the manufacturing of methamphetamine. On the floor in the front of the truck were two one-gallon containers for Coleman fuel. Deputy Miller also found a large red mixing bowl containing a cloth with a white, powdery substance on it. Deputy Miller also found ephedrine that had gone through the process of adding lithium and anhydrous ammonia, some of the steps necessary to manufacture methamphetamine. Deputy Miller summed up the situation as follows: "In the 1982 Blue Chevy Truck, there was chemicals [sic] undergoing the process of manufacturing methamphetamine. It was an active meth lab." The total weight of the substances sampled in the red bowl was 58.82 grams. When confronted with the contents of the red bowl, Walter responded "This is [expletives deleted], you guys are setting me up, someone set me up."

He was charged with one count of attempted manufacture of a controlled substance (methamphetamine) under Section 195.211 and one count of maintaining a public nuisance (using a building for the illegal use and keeping of a controlled substance) under Section 195.130. It was also alleged that he was a prior and persistent drug offender.

Further facts are set forth as necessary in the discussion below.

## Point I: SUFFICIENCY OF THE EVIDENCE

In his first point, Walter argues that the trial court erred in overruling his motions for judgment of acquittal and in entering judgment and sentences on both counts because there was insufficient evidence that he had the requisite knowledge of how to manufacture methamphetamine, that he had the intent to do so, or that he participated in an attempt to manufacture methamphetamine. He also argues accordingly that there was insufficient evidence to prove that he was guilty of the offense that he kept or maintained a public nuisance.

### Standard of Review

Our review of a challenge to the sufficiency of the evidence supporting a criminal conviction is limited to a determination of whether the trier of fact, based upon all of the evidence, reasonably could have found the defendant guilty. *State v. Blankenship*, 415 S.W.3d 116, 121 (Mo. banc 2013) (citation omitted). We "do not weigh the evidence but accept as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict and ignore all contrary evidence and inferences." *Id.* (internal citation omitted).

6

## Discussion

Walter was convicted of violating Section 195.211, attempted manufacture of a controlled substance, and Section 195.130, maintaining a public nuisance. Under Section 195.211.1, "it is unlawful for any person to distribute, deliver, manufacture, produce or attempt to distribute, deliver, manufacture or produce a controlled substance or to possess with intent to distribute, deliver, manufacture, or produce a controlled substance." Under Section 195.130.1, "[a]ny room, building, structure or inhabitable structure as defined in section 569.010 which is used for the illegal use, keeping or selling of controlled substances is a 'public nuisance.' No person shall keep or maintain such public nuisance."

To sustain a conviction on a charge of attempting to manufacture methamphetamine, the State must prove that: (1) the defendant took a substantial step toward commission of the offense; and (2) the defendant engaged in such conduct with the purpose of committing the offense. *State v. McLarty*, 327 S.W.3d 557, 562 (Mo. App. S.D. 2010) (citation omitted). Pursuant to Section 564.011.1, a "substantial step" is "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." "Therefore, an attempt to manufacture methamphetamine requires conduct strongly corroborative of the act of producing methamphetamine." *McLarty*, 327 S.W.3d at 562. *See also State v. Mickle*, 164 S.W.3d 33, 42 (Mo. App. W.D. 2005) (the State had the burden to prove that the defendant, "with the purpose of manufacturing methamphetamine, did any act that was a substantial step toward the commission of that offense").

To prove that Walter engaged in a substantial step through the possession of materials used to manufacture methamphetamine, we apply "the same standard of actual or constructive possession in manufacturing cases as is used in possession cases." *State v. Farris*, 125 S.W.3d 382, 387 (Mo. App. W.D. 2004) (citation omitted). The State thus had to establish two elements: (1) that Walter had conscious and intentional possession of the substance, either actual or constructive, and (2) that he was aware of the "presence and nature of the substance." *Id.* (citation omitted).

In the case at bar, however, Walter failed to raise any challenge to the sufficiency of the evidence regarding possession or awareness of the substance in his point relied on. Instead, Walter limits his argument to the allegation that the State failed to prove that he "knew how to manufacture methamphetamine, that he had the intent to do so or that he participated in an attempt to manufacture methamphetamine." The failure to include this challenge in a point relied on is a sufficient basis to deny review of it. *Mickle*, 164 S.W.3d at 46. Because Walter did not challenge possession or awareness in his point relied on, we do not review those elements in detail.

Left solely with the allegation that the State failed to prove intent,[3] in our review of the record we disregard all evidence and inferences to the contrary. The record indicates that Walter and his girlfriend while together bought substantial quantities of pseudoephedrine, lithium batteries, and Coleman fuel, all ingredients used in the production of methamphetamine, less than twenty-four hours before Walter was arrested.

---

[3] The mental state for attempt to manufacture methamphetamine under Section 195.211 is "purposely or knowingly." *State v. Cates*, 3 S.W.3d 369, 371 (Mo. App. S.D. 1999) (citing Section 562.021.3).

Walter and Martinson made those purchases under suspicious circumstances, buying from multiple locations. Martinson testified that she purchased these items with the intent to manufacture methamphetamine. The pseudoephedrine pills that Walter purchased independently were also used to produce methamphetamine at Walter's home. Walter purchased pseudoephedrine in excess of what is authorized by law and attempted to purchase additional quantities but was denied the ability to buy them by the business from which he attempted to purchase them. *See* § 195.418.

When Walter was taken into custody there was a white, powdery substance located near him in the basement of his house. Also in the basement, police found a syringe in the pocket of a pair of jeans shorts that were too big for Martinson as well as methamphetamine located in an empty bourbon bottle. There was an "active meth lab" located in and around a truck owned by Walter that was located in Walter's garage while he was physically at his home. A large quantity of methamphetamine, 58.82 grams, was found in Walter's truck. Walter had routine access to the places where the methamphetamine was found, which in and of itself is sufficient for a reasonable juror to have determined that he had or shared constructive possession of the methamphetamine. *See State v. Carl*, 389 S.W.3d 276, 287 (Mo. App. W.D. 2013). There is also sufficient evidence for a reasonable juror to have found that Walter knew of the presence of the manufacturing process, which was located in his truck, in his garage, and comprised of materials he had purchased alone or in concert with Martinson hours earlier. *Id.* Thus, there is sufficient evidence that Walter took a substantial step in an attempt to

manufacture methamphetamine in that there was conduct strongly corroborative of the act of producing methamphetamine.

In arguing that the State failed to prove intent to manufacture methamphetamine, Walter relies primarily on *State v. Lubbers*, 81 S.W.3d 156, 162 (Mo. App. E.D. 2002), and *State v. Deadmon*, 118 S.W.3d 625, 628 (Mo. App. S.D. 2003), both of which were cases charged under Section 195.420, a statute addressing possession of chemicals that also requires proof of "intent to manufacture . . . a controlled substance."  Walter relies on *Lubbers* for the proposition that the State had to prove that he knew how to manufacture methamphetamine.  But a closer examination of *Lubbers* does not bear out his strained reading of the opinion.  In *Lubbers*, although there was evidence that the defendant knew that her boyfriend was manufacturing methamphetamine in his automobile, there was no evidence that the defendant participated in the manufacture.  The court did note in passing that nothing in the record indicated that the defendant intended or knew how to manufacture methamphetamine, but the *Lubbers* court in no way held that under the statute the State was required to prove that a defendant knew how to manufacture the illegal substance.  *See Mickle*, 164 S.W.3d 49-50 (holding that knowledge of how to manufacture methamphetamine is not a statutory element despite the loose language in *Lubbers*).

Walters relies on *State v. Deadmon* also for the proposition that the State in this case proved possession but not intent to manufacture.  118 S.W.3d at 628.  In *Deadmon*, the evidence was sufficient to prove only that the defendant knowingly possessed anhydrous ammonia as a passenger in a vehicle carrying the chemical, not that he

10

intended to use it to manufacture a controlled substance. *Id.* at 628. Here, however, there was evidence that Walter undertook a substantial step in attempting to manufacture methamphetamine based in part on his purchase of the ingredients to manufacture methamphetamine with Martinson just hours before he was arrested. Additionally, unlike in the case at bar, the State in *Deadmon* conceded that it failed to carry its burden of proving the element of intent. *Id.* at 628.

Walter's broad arguments from *Lubbers* and *Deadmon* that the State "failed to produce any evidence whatsoever that [he] knew how to manufacture methamphetamine or that he had ever participated in the manufacture of methamphetamine" are without merit. The statute does not require proof that a defendant has exact knowledge of how to manufacture methamphetamine or that he has ever done so in the past. This point is denied.

## Point II: SEARCH WARRANT

In his second point, Walter argues that the trial court clearly erred in failing to sustain his motions to quash the search warrant and suppress evidence and in allowing the admission of evidence obtained as a result of the issuance and execution of the search warrant. Specifically, Walter contends (a) that the searches of the garage, outdoor furnace, and Chevrolet truck were beyond the scope of the search warrant, (b) that the affidavit supporting the search warrant contained false and/or unsubstantiated

information, and (c) that the officers illegally executed the search warrant by not allowing Walter to be present during the search and completion of the inventory.[4]

## Standard of Review

In *State v. Stoebe*, 406 S.W.3d 509, 514-15 (Mo. App. W.D. 2013), we set forth our standard of review for a motion to suppress as follows:

> A trial court's ruling on a motion to suppress may be reversed only if it is clearly erroneous. Our review is limited to a determination of whether the trial court's ruling is supported by sufficient evidence from the record as a whole. In reviewing a trial court's order on a motion to suppress, this court considers all facts and reasonable inferences in the light most favorable to the challenged order. The appellate court must defer to the trial court's determination as to the credibility of witnesses. This court may not substitute its discretion for that of the trial court when reviewing an order suppressing evidence. Nonetheless, this court must consider the ruling in light of the proper application of the precepts of the Fourth Amendment. The ultimate issue of whether the Fourth Amendment was violated is a question of law which this court reviews de novo. If the trial court's ruling is plausible in light of the record viewed in its entirety, this court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. The trial court was free to disbelieve any of the state's proof, even if uncontradicted.

(Quotation marks and citations omitted).

Additionally, in reviewing a motion to suppress that was denied by the trial court, we consider the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling. *State v. Gaw*, 285 S.W.3d 318, 319 (Mo. banc 2009).

---

[4] Walter's second point on appeal brings multiple claims of error, which is a sufficient basis to deny relief. *State v. Brightman*, 388 S.W.3d 192, 196 (Mo. App. W.D. 2012) (citing *State v. Agee*, 350 S.W.3d 83, 96-97 (Mo. App. S.D. 2011)). "Multiple claims of error in one point relied on render[ ] the point multifarious and as such is a violation of Rule 84.04, made applicable to briefs in criminal appeals by Rule 30.06(c). *Agee*, 350 S.W.3d at 96-97. "Generally, multifarious points preserve nothing for appellate review and are ordinarily subject to dismissal." *Id.* In this matter we exercise our discretion to review the issues presented.

12

To the limited extent that Walters challenges the probable-cause determination of the judge issuing the warrant, we note that our standard of review is also whether the challenged action was "clearly erroneous." As our Supreme Court stated:

> [I]n reviewing a trial court's ruling on a motion to suppress evidence seized pursuant to a search warrant, the court gives great deference to the initial judicial determination of probable cause that was made at the time the warrant issued. Because there is a strong preference in the Fourth Amendment for searches to be conducted pursuant to a warrant, a reviewing court should not quash a warrant by construing it in a hypertechnical, rather than a commonsense, manner. The duty of a reviewing court is simply to ensure that the issuing judge had a substantial basis for determining that probable cause for the search did exist. In conducting the review of whether probable cause exists, the appellate court may not look beyond the four corners of the warrant application and the supporting affidavits. The court will only reverse if the issuing magistrate or judge clearly erred in initially determining, based on the totality of the circumstances, that probable cause existed.

*State v. Neher*, 213 S.W.3d 44, 49 (Mo. banc 2007).

### Scope of Warrant

As noted above, the search warrant described the location to be searched as follows:

> A residential structure with a street address of 24808 155th Road in Saline County, Missouri, located on the south side of 155th Road, and described as a gray single-story wood frame home, with vinyl siding and a wooden deck located on the south side of the residence. The residence has a basement and a detached two car garage. In addition, there is an outdoor wood burning furnace on the exterior of the residence.

Walter argues that the search warrant only authorizes a search of the "residential structure" and that does not include the detached garage, the truck, or the outdoor furnace. We thus review whether the trial court erred in not suppressing evidence obtained from the search of those additional areas pursuant to the warrant.

The Fourth Amendment to the United States Constitution and Article I, section 15 of the Missouri Constitution provide the same guarantees against unreasonable searches and seizures. *State v. Robinson*, 379 S.W.3d 875, 880-81 (Mo. App. S.D. 2012). A search warrant must particularly describe the place to be searched and the persons or things to be seized. *Id.* (citation omitted). Pursuant to Section 542.276.2(4), a search warrant must "[i]dentify the person, place, or thing which is to be searched, in sufficient detail and particularity that the officer executing the warrant can readily ascertain whom or what he or she is to search." In the case at bar, the description of the place to be searched is a residence. The description of that residence indicates that it "has" -- which in this case is synonymous with "includes" -- a "basement," "detached two car garage," and "outdoor wood burning furnace." Walter fails to adequately explain how the language of the search warrant, on its face, does not authorize a search of the garage, the furnace or the items within those structures.

Even if we were to construe the language of the warrant to be limited solely to the residential structure and even if we were to find that the inclusion of the language regarding the detached garage and outdoor furnace was solely included to assist the officers in identifying the exact residential structure that they were authorized to search, Walter's argument would still be without merit. Fourth Amendment protection of a person's home extends to the curtilage around the home. *State v. Woodrome*, 407 S.W.3d 702, 707-08 (Mo. App. W.D. 2013) (citation omitted). Curtilage "is generally defined as the enclosed space of ground and buildings immediately surrounding the dwelling

14

house."[5]  *Id*. at 707.  Put another way, "curtilage includes all out-buildings used in connection with the residence, such as garages, sheds, barns, yards, and lots connected with or in the close vicinity of the residence."  *State v. Berry*, 92 S.W.3d 823, 829 (Mo. App. S.D. 2003) (citation omitted).  "If a dwelling is subject to a search, as by a warrant, then the curtilage may also be searched pursuant to the warrant, even if it is not specifically mentioned in the warrant."  *Woodrome*, 407 S.W.2d at 708.  Whether or not an area surrounding a dwelling is within the dwelling's "curtilage" is generally assessed on a case-by-case basis.  *State v. Cady*, 425 S.W.3d 234, 241 (Mo. App. S.D. 2014).  *See also State v. Potter*, 72 S.W.3d 307, 314 (Mo. App. S.D. 2002) (citing with approval a case noting that curtilage includes vehicles or buildings within residence).

In this case, the warrant provided the address of the residence and described the residential structure.  The warrant also indicated that the residence has a basement, a two-car detached garage, and a wood-burning fireplace.  The record indicates that the detached garage is located within ten feet from the residence and that the wood-burning furnace is "fairly close" to the residence.  The record also indicates that both structures are connected to the residence through electrical wiring, and that the furnace has underground pipes or ducts connecting it to the house to provide heat.  Additionally, the 1982 Chevy truck was located inside of the garage.  There was a strong chemical odor upon entering the garage coming from the "active meth lab" in the truck.  Therefore, even if the warrant had failed to include the fireplace, the outdoor furnace, or the detached

_____

[5] Courts generally weigh four factors in determining whether the area surrounding a dwelling is curtilage: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) steps taken to protect the area from observation by people passing by.  *Cady*, 425 S.W.3d at 241.

15

garage containing the truck -- an argument for which we find no merit -- the trial court acted well within its discretion to determine that these areas fell within the curtilage of the residence and could be searched pursuant to the authority of this search warrant.

**Affidavit in Support of Search Warrant**

Also in his second point, Walter argues that the search warrant was deficient and that the evidence therefrom should have been suppressed because the affidavit submitted in support of the warrant contained false and/or unsubstantiated information. Specifically, Walter argues that the affidavit contains two statements indicating falsely that Walter had prior drug-related convictions in Lincoln County, Missouri such that the resulting warrant and thus the search and seizure were therefore tainted. To that end, although Walter does not cite *Franks v. Delaware*, 438 U.S. 154, 164 (1978), Walter's argument appears to be that, without the allegedly tainted statements, the warrant was void of probable cause. The paragraph in question states:

> I am familiar with Mr. Walter, and I know him to be heavily involved in the methamphetamine community. I am aware that Mr. Walter has prior felony drug convictions for possession of a controlled substance in Lincoln County, Missouri, in 2001, possession of a controlled substance in Lincoln County, Missouri, in 2002, possession of a controlled substance in Saline County, Missouri, in 2007, possession of a controlled substance in Saline County, Missouri, in 2008, and is currently on bond in Clay County, Missouri, for the charge of possession with intent to distribute.

At the suppression hearing, Walter asked Trooper Sullivan the basis for the statement that he had Lincoln County convictions. Trooper Sullivan responded that this information was obtained from a criminal history request he made to his headquarters, though he did not know which database contained this information. The parties

16

stipulated at the suppression hearing that *if* Walter were placed under oath, he would testify that he had no criminal convictions in Lincoln County, Missouri. However, Walter did *not* testify, and on appeal he does not include a citation to the record definitively indicating that this information was inaccurate, only that he would have testified that no such convictions existed. The additional possession convictions arising from outside of Lincoln County have never been disputed.

The crux of Walter's argument appears to be that the allegedly false information regarding two of the five drug possession charges would eliminate the probable cause necessary for the search warrant, and he argues that the trial court accordingly erred in not suppressing the evidence. As noted above, we will reverse a trial court's ruling on a motion to suppress only "if it is clearly erroneous." *Stoebe*, 406 S.W.3d at 514-15. Our review in that capacity is limited to a determination of whether the ruling is "supported by sufficient evidence from the record as a whole." *Id.*

The heart of Walter's argument is that the application (including the affidavit) did not establish probable cause due to the false statements contained therein, however, we note that *Franks* established a procedure requiring a defendant to plead specifically any alleged *Franks* violation and make an offer of proof. *Franks*, 438 U.S. at 171. The *Franks* Court summed up the requirement as such:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

17

*Id.*

"The effect of finding a *Franks* violation is that when the trial court determines there has been a 'deliberate falsehood or [] reckless disregard for the truth' by the affiant, the trial court must set aside the false material and consider the affidavit's remaining contents in determining whether probable cause existed at the time the warrant was issued." *State v. Brown*, 382 S.W.3d 147, 168 (Mo. App. W.D. 2012) (quoting *Franks*, 438 U.S. at 155-56). "When a defendant has made a proper pleading and offer as required by *Franks*, the defendant is entitled to a hearing to demonstrate the contentions asserted." *Id.*

In this case, Walter did not make a proper pleading or an offer of proof to any lower court that the two Lincoln County convictions were included erroneously in the affidavit pursuant to *Franks*. Other than an oral stipulation of what his testimony (not subject to cross-examination) would have been on the matter, Walter did not submit records or any other evidence. In the words of the *Franks* Court, "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." 438 U.S. at 171. "Allegations of negligence or innocent mistake are insufficient." *Id.* Walter has wholly failed to take the required steps necessary to preserve this point for our review.

Even if Walter had taken the required steps under *Franks* and then had established that the information regarding these convictions was in fact false, it is still evident that there was no error. "[W]e consider whether, after the court had set aside the information that we allow to be improper under the 'clearly erroneous' standard, the remainder of the

18

assertions in the affidavit (those that were not shown to be obtained unlawfully or that were intentionally or recklessly false) were sufficient to support the warrant." *State v. Brown*, 382 S.W.3d 147, 168 (Mo. App. W.D. 2012) (emphasis omitted). As noted above, the affidavit indicated: (1) that the trooper had received information that Walter was "cooking" methamphetamine that night in the basement of his residence, (2) that he learned another individual was at Walter's "getting ready to get high," (3) that Walter said to an informant that it "snowed last night," meaning that he had cooked methamphetamine, (4) that a Missouri database available to law enforcement indicated that Walter had made two purchases of ephedrine and pseudoephedrine on August 4, 2011, which exceeded the amount of legal purchase of that product for the twenty-four hour period, and additionally that Walter was denied purchases of pseudoephedrine at Wal-Mart on August 4, 2011 twice because he attempted to purchase in excess of the allowed amount, and (5) that Martinson had also purchased pseudoephedrine on August 4, 2011. Additionally, the affidavit references three prior possession convictions that are undisputed.

There is no definitive indication that the information was in fact false, or even that if it were that the inclusion of that allegedly false information in the affidavit was intentional or unintentional, but, even granting that it was false, if the objectionable material is removed from the affidavit, the remaining portions of the affidavit and application for the warrant as a whole provide sufficient information to support the issuance of the warrant. The trial court did not err in denying Walter's motion to suppress on this basis.

## Defendant's Presence during Search and Inventory

Also in his second point, Walter argues that evidence obtained pursuant to the search warrant was not admissible because it was unlawfully executed. Specifically, Walter contends that the language in the warrant required the officers to allow Walter to remain on the premises and conduct the search and complete the inventory in his presence.

> The portion of the search warrant in question stated:
>
> NOW THEREFORE, these are to command you to search the said premises above described within 10 days after the issuance of this Warrant, by day or night, and take with you, if need be, the power of your county, and if the above described items or any part thereof be found on said premises by you, that you seize the same and take the same into your possession, making a complete and accurate inventory of the items so taken by you in the presence of the person from whose possession the same is taken, ***if that be possible***, and giving to such person a receipt for such property . . . .

(Emphasis added.)

The record indicates that Walter was placed under arrest at the beginning of the execution of the search warrant when Trooper Sullivan observed a Wal-Mart card with white powder residue on it with a razor blade next to it and a corner-cut baggie with white powder residue inside it near Walter in the basement. At the suppression hearing, Trooper Sullivan testified that "officer safety" made it impossible to let Walter and Martinson remain in the home during the execution of the search warrant. Also at that hearing, on cross-examination by Walter regarding the allegation of "officer safety," Trooper Sullivan testified "I don't know if you're aware, but there was actually a shooting at this residence that we," at which point Walter's counsel cut off the response. There

20

was no objection to that testimony. At trial, Corporal Darrin Lilleman ("Corporal Lilleman") testified that the search warrant was executed the way it was because of "officer safety" as there had been a previous warrant issued at that residence (though Walter was not a suspect) in connection with a shooting. *See infra* Point III. Also, the record indicates that after the search warrant was executed, Walter was presented with the return of inventory.

Section 542.296.5(4) states that a motion to suppress may be based upon the ground that "the warrant was illegally executed by the officer." However, "[t]he search warrant carries with it the right to detain the occupants of the house while the officers conduct[] the search." *State v. Rios*, 840 S.W.2d 284, 287 (Mo. App. W.D. 1982) (quoting *Michigan v. Summers*, 452 U.S. 692, 694 (1981)). It is lawful to require a defendant to remain in the house until evidence establishing probable cause to arrest is found, and an arrest and search incident to arrest in those circumstances are constitutionally permissible. *Id.* (quoting *Summers*, 452 U.S. at 694).

In this case, nothing from the record indicates that the officers violated either the law or the language of the warrant. Around the time he presented the search warrant to Walter, Trooper Sullivan noticed a white, powdery substance that he found suspicious. At that point, he had probable cause to arrest Walter under *Summers*. Additionally, the record does not definitively indicate that the inventory was conducted outside of Walter's presence since there was testimony describing his response when presented with the red bowl of methamphetamine. Even if, however, the inventory was conducted outside of Walter's presence, the search warrant in this case required the officers to make a complete

21

and accurate inventory of the items taken in the presence of the person only "*if that be possible*." Trooper Sullivan and Corporal Lilleman both testified that "officer safety" made such a course of action not possible.[6] The factual or credibility question of whether it was "possible" to perform the inventory of the items seized in the presence of Walter is properly left to the trial court. *Stoebe*, 406 S.W.3d at 514-15. As noted above, our review is limited to a determination of whether the trial court's ruling is supported by sufficient evidence from the record as a whole. *Id.*[7]

The trial court did not err in denying Walter's motion to suppress on any of the three bases raised by Walter in this point. This point is denied.

### Point III: EVIDENCE OF OTHER CRIMES

In his third point, Walter argues that the trial court abused its discretion in denying his objection at trial to evidence of other crimes and in failing to grant his request for a mistrial when the State asked an officer whether he had been to Walter's house before to serve other search warrants and in allowing evidence of other crimes into evidence.

### Standard of Review

Our standard of review for the admission of evidence is abuse of discretion. *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011) (citation omitted). "This standard gives the trial court broad leeway in choosing to admit evidence; therefore, an exercise of this

---

[6] Exactly why the officers believed their safety was in danger when Walter was arrested and in handcuffs while there were ten armed officers present at the scene to maintain custody of Walter and also conduct the search of the premises is unclear from the record.

[7] Walter cites no authority to support his argument that, even had the trial court found that the law enforcement officers did in fact violate the terms of the search warrant by failing to conduct the inventory in his presence when it was in fact possible to do so, such a violation of the language of the warrant mandates that the items seized pursuant thereto must be suppressed. We find it unnecessary to reach this issue for the reasons stated herein.

22

discretion will not be disturbed unless it is clearly against the logic of the circumstances." *Id.* "The trial judge is also in the best position to weigh the probative value of the evidence against its prejudicial effect." *State v. Williams*, 420 S.W.3d 713, 721 (Mo. App. W.D. 2014). "Only if the error is so prejudicial that it deprived the defendant of a fair trial is reversal warranted." *Id.* "Trial court error is not prejudicial unless there is a reasonable probability that it affected the outcome of the trial." *Id.*

## Discussion

Walter argues that the trial court abused its discretion in denying his objection when Corporal Lilleman testified at trial about a previous search warrant served on the address for spent bullets and shell casings. Walter also argues that the error was magnified by Corporal Lilleman carrying a big bundle of documents with him to the witness stand, "which the jury certainly discerned were about previous Search Warrants for the Appellant's property."

The record reflects that the trial court entertained extensive off-the-record argument by Walter and the State, including a *voir dire* of Corporal Lilleman, prior to his testimony. The State argued then, as it does on appeal, that Walter opened the door to Corporal Lilleman's testimony by suggesting that Corporal Lilleman had no valid "officer safety" concern when he removed Walter from the house during the execution of the search warrant.

"The doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of *related* evidence on direct examination." *Barnett v. State,* 103 S.W.3d 765, 773 n.5

23

(Mo. banc 2003) (citing *United States v. Durham*, 868 F.2d 1010, 1012 (8th Cir. 1989) (emphasis added)). The doctrine is limited to testimony that might explain or contradict the testimony offered by the opposing party on direct examination; it cannot be subverted into a rule for injection of prejudice. *Durham*, 868 F.2d at 1012 (citation and quotation marks omitted). Indeed, "[o]therwise inadmissible evidence can nevertheless become admissible because a party has opened the door to it . . . through cross-examination." *State v. Shockley*, 410 S.W.3d 179, 194 (Mo. banc 2013). Where "the defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." *Id.* (citation omitted). "Similarly, otherwise inadmissible evidence can become admissible if its purpose is to explain subsequent police conduct." *Id.* (citation omitted).

Here, in cross-examining Corporal Lilleman, Walter attempted to show that the officers violated the terms of the warrant by removing Walter from the premises prior to completing the inventory. Corporal Lilleman responded that Walter was removed because of concerns regarding "officer safety." In his examination of Corporal Lilleman, Walter attempted to show that officer safety was not a genuine concern by asking whether Walter was a "threat" to the officers, whether he had "any weapons" or a "history of violence," or whether Walter had "[ever] been accused of a violent crime." Corporal Lilleman at one point stated "if we're going to talk about officer safety--", but Walter cut off the statement. It was not until redirect examination that Corporal Lilleman testified about the previously executed search warrant for bullets.

24

After careful review of the record, we see no abuse of discretion in the trial court's admission of this evidence. Walter opened the door to questions about the execution of a past search warrant regarding a shooting, when he pressed the issue of "officer safety." *Shockley*, 410 S.W.3d at 194. Additionally, the testimony was necessary to explain police conduct in the officers' determination that officer safety made it impossible for Walter to be present during the search and/or inventory. *Id.* Finally, Walter cites no authority indicating that a witness is prohibited from bringing a bundle of documents to the witness stand. "Rule 84.04(d) requires that an Appellant provide appropriate citation to authority in support of his contentions." *Rios v. State*, 368 S.W.3d 301, 312 (Mo. App. W.D. 2012) (quotation omitted). "If no authority exists on the issue, an explanation for the absence of authority is required." *Id.* (quotation omitted). "If no explanation is given, we may consider the point to be abandoned." *Id.* (quotation omitted). Accordingly, we deem this argument abandoned. Further, Walter established no factual record as to what was in fact included in the bundle of records that Corporal Lilleman had with him on the witness stand or any factual record that the jury had any knowledge that those records may or may not have included information regarding prior searches of Walter's house.

This point is denied.

### Point IV: HEARSAY EVIDENCE

In his fourth point, Walter argues that the trial court abused its discretion in denying his hearsay objection to Trooper Sullivan's testimony that at the police station he saw an incoming text message to Nicholson from someone named "Chad" and that he listened in on a telephone call that Nicholson received from Walter.

## Standard of Review

Walter made no objection to Trooper Sullivan's testimony that he saw a text message that the phone's contacts indicated was coming from someone named "Chad." We therefore review the admission of that statement for plain error. Rule 30.20[8] authorizes us to review at our discretion "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "The plain error rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *State v. Letica*, 356 S.W.3d 157, 167 (Mo. banc 2011). "Errors are plain if they are evident, obvious, and clear." *State v. Loyd*, 326 S.W.3d 908, 911 (Mo. App. W.D. 2010) (citation omitted).

Walter objected to Trooper Sullivan's testimony about what he heard Walter tell Nicholson in the subsequent phone conversation on the ground of hearsay. As noted above, we review a ruling on the admissibility of evidence for an abuse of discretion. *Primm*, 347 S.W.3d at 70. "The trial judge is also in the best position to weigh the probative value of the evidence against its prejudicial effect." *Williams*, 420 S.W.3d at 721. "Only if the error is so prejudicial that it deprived the defendant of a fair trial is reversal warranted." *Id.* "Trial court error is not prejudicial unless there is a reasonable probability that it affected the outcome of the trial." *Id.*

---

[8] All rule references are to Missouri Supreme Court Rules (2014).

26

Walter argues that Trooper Sullivan's testimony on these two pieces of evidence constituted inadmissible hearsay. "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends upon the veracity of the statement for its value." *State v. Tisius*, 362 S.W.3d 398, 405-06 (Mo. banc 2012) (citations omitted). "A hearsay statement is inadmissible unless it is a recognized hearsay exception." *Id.*

We begin with plain-error review of Walter's assertion that the trial court erred in admitting Trooper Sullivan's testimony that Nicholson received a text message on his phone from a contact delineated as "Chad." As noted above, the content of the text message was not admitted into evidence. Rather, Trooper Sullivan's testimony was only his observation that he read on Nicholson's cell phone a text from a contact delineated as "Chad." Because the content of the text message was not admitted into evidence -- there was no testimony as to an out-of-court statement by Walter -- there was no hearsay. Further, neither party argues that this text was in fact from a person named "Chad" and therefore it could not have been offered for the truth of the matter asserted and accordingly did not constitute hearsay. Finally, Walter offers no argument as to how he was prejudiced by the admission of testimony that Nicholson received a text from a person known as "Chad."

Walter cites *State v. Harris*, 358 S.W.3d 172, 175-76 (Mo. App. E.D. 2011) for the proposition that similar rules of admissibility should apply in the admission of text messages that apply in the admission of personal letters. Although the *Harris* court held

27

that there may have been error in the State's failure to lay a foundation as to who wrote the text messages, there was no hearsay analysis. Walter makes no argument as to improper foundation in his point relied on. *See Mickle*, 164 S.W.3d at 46. Further, unlike in the case at bar, the content of the messages in *Harris* was received into evidence, not just what an officer personally perceived in reading a contact name. Finally, even determining that the State failed to lay a proper foundation, the appellate court held that there was no prejudice. *Harris* does not aid Walter.

Walter's argument as to Trooper Sullivan's testimony about the telephone call between Nicholson and Walter fares no better. Trooper Sullivan testified that he listened in on a conversation which lasted about a minute or a minute and a half. Trooper Sullivan testified he recognized Walter's voice. The only portion of that phone conversation that was presented to the jury or included in the application for the search warrant was that Nicholson asked Walter if "it was fire" and Walter replied "yeah." Following a recess to conduct its own research on the issue, the trial court determined that the limited portion of the conversation which was offered into evidence was admissible either under the *res gestae* doctrine or to explain subsequent conduct by the witness. After a review of the record, we hold that the trial court did not abuse its discretion in so ruling.

If the statement is not offered for the truth of the matter asserted, it is not hearsay. *State v. Yung*, 246 S.W.3d 547, 555 (Mo. App. S.D. 2008) (citation omitted). "Thus, an out-of-court statement offered to explain subsequent police conduct is not hearsay and, if relevant, is admissible to supply relevant background and continuity." *Id.* "[W]hen such

28

out-of-court statements go beyond what is necessary to explain subsequent police conduct, they are hearsay." *State v. Allison*, 326 S.W.3d 81, 90 (Mo. App. W.D. 2010) (citation omitted). The rationale for this analysis is that by admitting hearsay statements for the limited purpose of explaining subsequent conduct "the triers of fact can be provided a portrayal of the events in question, more likely to serve the ends of justice in that the jury is not called upon to speculate on the cause or reasons for the officers' subsequent activities." *State v. Garrett*, 139 S.W.3d 577, 581 (Mo. App. S.D. 2004) (citation omitted).

Here, Walter's statement to Nicholson was not offered to prove that Walter attempted to manufacture methamphetamine. Rather, the testimony was offered to explain the subsequent course of Trooper Sullivan's investigation. As a result of the conversation coupled with additional information that he obtained from other sources, Trooper Sullivan obtained a search warrant for Walter's residence. Based on that limited four-word exchange and the other information received from other sources, *see supra* Point II, Trooper Sullivan included in his affidavit what he learned from Nicholson to support the application for the warrant to search Walter's residence. We therefore hold that the trial court did not err in admitting the four words exchanged between Nicholson and Walter because the testimony did not constitute hearsay. It supplied background and continuity to Trooper Sullivan's testimony and was relevant to explain the course of his investigation. *See State v. Simmons*, 233 S.W.3d 235, 238 (Mo. App. E.D. 2007) (holding that officer's testimony about victim's statements were admissible because they

29

provided relevant background and explained subsequent police conduct); *State v. Davenport*, 924 S.W.2d 6, 10 (Mo. App. E.D. 1996).

Assuming, however, that the admission of this testimony was error, Walter would still not be entitled to have his conviction overturned on this basis. That is because we review evidentiary rulings for prejudice, rather than mere error. *Williams*, 420 S.W.3d at 721. In order to reverse, an error must have been so prejudicial that it deprived the defendant of a fair trial. *Id.* In a criminal case, the test for prejudice is whether the error was outcome-determinative. To be outcome-determinative, the prejudice resulting from improper admission of evidence must have "had an effect on the jury's deliberation to the point that it contributed to the result reached." *State v. Barriner*, 210 S.W.3d 285, 304 (Mo. App. W.D. 2006) (citation omitted). It is the defendant's burden to establish this level of prejudice in order to be entitled to a reversal. *Id.*

Walter did not meet this burden. As discussed above, Walter was found in the basement of his home with methamphetamine near him and in plain view of the officers; methamphetamine also was located in a glass bourbon bottle in the bar area of the basement and a syringe in a pair of jeans shorts was found near Walter. The remnants of an attempt to manufacture methamphetamine were found in Walter's outdoor furnace. An active methamphetamine lab was in progress in and around Walter's truck located in the detached garage of his home. He had routine access to these areas. He surreptitiously purchased the ingredients to produce methamphetamine by shopping at multiple merchants just hours before he was arrested. A large amount of methamphetamine was found in Walter's Chevrolet pickup. When considered with and balanced against all of

this properly admitted evidence, there is no reasonable probability that the jury would have acquitted Walter of attempt to manufacture methamphetamine if the trial court had excluded this limited portion of the conversation between Walter and Nicholson.[9]

This point is denied.

## Point V:    CLOSING ARGUMENT

In his fifth and final point, Walter argues that the trial court erred in overruling his motion for a new trial because the State's conduct during closing arguments deprived him of his right to due process of law and a fair trial.  Specifically, Walter argues that during its closing argument the State showed a slide of a photo on a large display screen (a power-point presentation) of an enlarged mug shot of Walter dressed in orange jail clothing with the word "GUILTY" digitally superimposed in block red letters across the front of the photo and that this was used to inflame the jury.

### Standard of Review

Although Walter raised this issue in his motion for a new trial, he did not object to the photograph during closing argument, apparently because he was paying attention to the prosecutor's argument and he did not observe the photograph displayed on the screen. As noted above, Rule 30.20 authorizes us to review at our discretion "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."  "The plain error rule is to be used sparingly and may

---

[9] In addition to the trial court's stated rationale for allowing in the statement, we note that admissions of a party opponent are not considered hearsay.  "A statement can be admitted as an admission of a party opponent if it is material to the issues of the case, is relevant to the case, and is offered by the opposing party."  *State v. Eisele*, 414 S.W.3d 507, 514 (Mo. App. E.D. 2013).  A criminal defendant's admission "is relevant and material if it tends to incriminate the defendant, to connect the defendant to a crime, or to manifest the defendant's consciousness of guilt."  *Id*. (quotation marks and citation omitted).  *See also State v. Floyd*, 347 S.W.3d 115, 124 (Mo. App. E.D. 2011).  Walter's statements are additionally admissible under this doctrine.

31

not be used to justify a review of every point that has not been otherwise preserved for appellate review." *Letica*, 356 S.W.3d at 167. "Errors are plain if they are evident, obvious, and clear." *Loyd*, 326 S.W.3d at 911 (citation omitted).

"To prevail under the plain error standard, the defendant must show that the statements during closing argument had a decisive effect on the jury." *State v. Carter*, 415 S.W.3d 685, 691 (Mo. banc 2013). "Reviewing courts will rarely find plain error in closing remarks when the challenging party did not object at trial because any action on the part of the court would be uninvited." *Id.* (citations omitted). "The defendant's failure to object to an improper argument is often strategic, and uninvited intervention may emphasize the matter in a way the defendant chose not to." *Id.* (citation omitted). "*Relief should rarely be granted on assertions of plain error as to closing argument* because, in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Thompson*, 985 S.W.2d 779, 787-88 (Mo. banc 1999) (citation omitted; emphasis added).

### Discussion

Although it is not part of the record on appeal, it is uncontested that a smaller version of the mug shot without the term "guilty" was admitted into evidence during the State's rebuttal. During rebuttal, the State called the Saline County Jail Administrator as a witness. During the administrator's testimony, the State introduced booking records, including an intake medical questionnaire indicating that Walter did not have a cough, sore throat, runny nose, fever, or a history of allergies, asthma, hay fever, or any other

32

medical conditions. That evidence was used to rebut Walter's evidence that he had health reasons for purchasing substantial quantities of pseudoephedrine. Walter objected to the records on numerous grounds, including that the State had not previously disclosed them, that the State had not laid a proper foundation for them to qualify as business records, as well as on Fifth Amendment grounds, but he did not otherwise object specifically to the admission of the photograph, evidently because he did not focus on it as part of the booking records. The prosecutor did not ask any questions of the administrator related to the mug shot, nor was the mug shown or published to the jury during the administrator's testimony or at any time during the presentation of evidence.

The photo, in fact, was not displayed to the jury until closing argument. Then, however, the jury did not view the photo in the same format as it was when introduced into evidence. Instead, it was displayed to the jury in an enlarged format on a video screen with the word "GUILTY" superimposed upon it in bold, red letters. Not only did the jury never view the mug shot in its unaltered form, but as noted above, also the photo was shown in color, such that Walter's bright orange jail uniform was clearly visible to the jury.

After the jury returned its verdict of guilty, the following colloquy occurred:

Defense Counsel: Judge, there were some images portrayed, published to the jury in closing argument by the State, which I confess I didn't notice, I guess I was watching the prosecutor and not the screen, but there are a couple of objections I should have made during that closing argument to things that I realized later were on the screen. . . . I understand that the last image played by the State for the jury was a large, garish color photo of the defendant in jail clothing, with the word, guilty, stamped across it. And I certainly would have objected strenuously to those things had I --

33

The Court:  I didn't, I didn't see that myself.

Defense Counsel:   . . . If that photo was actually in evidence to begin with, and I didn't consider it in evidence, I assumed that we were talking about the printed record, not the photograph stapled to it. . . .

The Court:   Well, [exhibit 151], it's a piece of evidence, it can't be, I mean it was received.  Frankly, lawyers have gotten, seasoned lawyers with gray hair, and no hair, and younger lawyers, have all gotten out of the old habit of sharing an exhibit with the other side and then showing it to the judge.

I didn't, I didn't see any of these.  And that's no criticism of you, that's just the way lawyers are doing it now, but there's probably a good reason for the old way of doing it.  I know 151 is in, but it was never displayed to me.

It is a longstanding principle in Missouri that a defendant "cannot be forced to appear in court wearing identifiable prison clothing, because compelling an accused to display himself so dressed to the jury 'disparages the presumption of innocence and impairs a fair trial.'"  *State v. Harris,* 868 S.W.2d 203, 208 (Mo. App. W.D. 1994) (citation omitted).  While Walter was not forced to wear his inmate jumpsuit in the presence of the jury, showing a mug shot of a defendant in bright, orange inmate clothing with the word "GUILTY" displayed across it in bold letters clearly disparages a defendant's presumption of innocence.

It defies logic why even an overzealous prosecutor would tempt the grant of a mistrial during closing argument on a case where the evidence of guilt is this overwhelming.  The display of the photograph alone raises serious concerns and the addition of the large red letters across the photo reading "GUILTY" increases the concerns exponentially.  Such egregious conduct on the part of the prosecutor is unwarranted and cannot be condoned by any court.  Prosecutors have a duty "to serve

34

justice, not merely to win the case." *State v. Storey*, 901 S.W.2d 886, 901 (Mo. banc 1995). As a quasi-judicial officer representing the State, a prosecuting attorney's "duty is not to convict at any cost but to see that justice is done *and* that the accused receives a fair and impartial trial." *State ex rel. Jackson Cnty. Prosecuting Attorney v. Prokes*, 363 S.W.3d 71, 85 (Mo. App. W.D. 2011) (citation omitted; emphasis in original). "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of administration of justice suffers when any accused is treated unfairly." *Id.* (internal quotation omitted). A prosecutor "must not knowingly prejudice the right of the defendant to a fair trial by injecting into the case prejudicial and incompetent matters." *State v. Evans*, 820 S.W.2d 545, 548 (Mo. App. E.D. 1991) (internal quotation and citation omitted).

"The State has wide latitude in closing arguments, but closing arguments must not go beyond the evidence presented; courts should exclude 'statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury.'" *State v. Deck*, 303 S.W.3d 527, 543 (Mo. banc 2010) (internal quotation omitted). "A prosecutor should refrain from making irrelevant statements that only inflame a jury." *State v. Ozier*, 961 S.W.2d 95, 98 (Mo. App. E.D. 1998) (citation omitted).

Giving the State the widest possible latitude, there is still no rational justification for the prosecutor's use of the mug shot during closing argument.[10] Showing Walter

---

[10] To the extent the State suggests the prosecutor showed the mug shot to establish that Walter was not suffering from a sinus infection or allergies at the time of his arrest, such argument is without merit. At the end of the first portion of closing argument, the prosecutor showed the mug shot and stated: "[T]hat is simply not the face

wearing an inmate uniform with the word "GUILTY" prominently displayed across his face added nothing to the State's argument. Rather, the only purpose it could have served was to portray Walter in a negative light to the jury. Accordingly, the prosecutor injected incompetent and potentially prejudicial matters into its closing argument by displaying an altered piece of evidence to the jury for the sole purpose of affecting the jury's opinion of the defendant.

Thus, there is no question that the prosecutor's use of the altered mug shot was improper. However, the failure to preserve this error for appeal hinders our review. While it is unclear how visible the mug shot was to defense counsel when it was displayed during closing argument,[11] the record reflects that defense counsel waited until after the jury returned its verdict to raise any objection. "Failure to object at the earliest opportunity constitutes a waiver of the claim that the argument was erroneous" and limits our review to plain error. *State v. Lingle*, 140 S.W.3d 178, 190 (Mo. App. S.D. 2004) (internal quotation omitted). Improper closing arguments constitute plain error only "when the defendant shows that the improper comment had a decisive effect on the verdict." *State v. Chism*, 252 S.W.3d 178, 187 (Mo. App. W.D. 2008). *See also State v. Edwards*, 116 S.W.3d 511, 327 (Mo. App. W.D. 2010).

___

of someone who's suffering from a major sinus infection." Even if a juror could possibly infer the state of Walter's health from the mug shot, the word "GUILTY" obscures the majority of Walter's face on the mug shot. Therefore, the mug shot was of no aid to the prosecutor's closing argument and such an argument before this court is disingenuous.

[11] The record does not reflect whether the courtroom's layout prevented defense counsel from observing the slideshow displayed during closing argument. However, the fact that both defense counsel and the trial court indicated that they were unaware the mug shot had been displayed because their focus was on the jury suggests the slideshow was presented in such a manner that hindered defense counsel from observing it and, thus, objecting to it. Nevertheless, despite learning about the slide while the jury was deliberating, defense counsel chose to wait until after the jury rendered its verdict to make an objection and bring it to the court's attention. Thus, our review is limited to plain error. *State v. Hicks*, 803 S.W.2d 143, 147 (Mo. App. S.D. 1991) ("A party cannot fail to request relief, gamble on the verdict, and then if adverse, request relief for the first time.") (internal quotation omitted).

Thus, to find plain error in this case, it must be established that the prosecutor's use of the mug shot with "GUILTY" displayed across it had a decisive effect on the verdict. We cannot say that it did. There was overwhelming evidence of Walter's guilt presented at trial. Therefore, while the prosecutor's use of the mug shot with "GUILTY" explicitly written across it was clearly improper, we cannot say it had a decisive effect on the verdict. For that reason, we cannot say that a manifest injustice or miscarriage of justice resulted from the error.

In sum, under the circumstances, it was not at all "evident, obvious, and clear error" on the part of the trial court. *Loyd*, 326 S.W.3d at 911. In this case, Walter apparently did not focus on this part of the exhibit so as to form an objection to the photograph when it was offered into evidence. Additionally, any error in the admission of the evidence cannot be accorded to the trial court when the defense did not ensure that the court even saw the photograph or presented any objection regarding that portion of the exhibit. Finally, as noted above, where there is overwhelming evidence of defendant's guilt, errors concerning the prosecutor's closing argument are generally not viewed as having a decisive effect on jury deliberations. *Edwards*, 116 S.W.3d at 327. And, as noted above, there is overwhelming evidence that Walter was guilty of attempting to manufacture methamphetamine. Walter does not and cannot show that the photograph had a "decisive effect on the jury" in part because the record indicates that defense counsel and the judge did not even notice the photograph when it was shown on the screen to the jury. *Carter*, 415 S.W.3d at 691. In short, Walter's claim does not

facially establish substantial grounds that manifest injustice or a miscarriage of justice resulted from the State's closing argument.

This point is denied.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur